Mr. Justice Bradley
dissenting:
I am unable to concur with the majority of the court upon this motion, and quite regret the necessity which compels me to give expression to the reasons of my dissent.
While recognizing the fact that the criticisms upon this indictment have the countenance of some elderly precedents, I have been unable to find any case in which the principal question raised in this motion has been determined by any court; certainly no such case was cited in argument or upon the briefs, and I cannot avoid the thorough conviction that the proposition contended for lacks the support either of reason or common sense.
The motion is based upon two grounds. First, because it nowhere appears upon the face of the indictment that the death of Agnes Watson is legally charged, and second, because it does not appear upon the face of the indictment that the death occurred within a year and a day from the choking and drowning. The assault is alleged to have been made on the 23d day of June, 1888, the indictment was'filed in open court September 24, 1888, and the motion in arrest of judgment was filed November 12, 1888.
In U. S. vs. Cruikshank, 92 U. S., 542, it is said that “ the object of the indictment is, first, to furnish the accused with such a description of the charge against him as will enable him to make his defense, and avail himself of his conviction or acquittal for protection against a further prosecution for the same cause; and, second, to inform the court of the facts alleged so that it may decide whether they are sufficient in law to support a conviction if one be had.” Viewing this indictment with reference to these objects, does it apprise the *88 accused, with reasonable certainty, of the nature of the accusation against him, so that he would be enabled to prepare his defense, and plead the judgment in bar to any subsequent prosecution for the same offense ? It charges the accused in plain and unmistakable language with the crime of the murder of Agnes Watson, by making an assault upon her on the 23d day of June, 1888, in the District of Columbia, throwing, pushing and casting her with malice aforethought into a certain canal there situate, wherein was a great quantity of water, by means of which throwing, etc., in the canal, she was then and' there mortally suffocated, choked, and drowned.. What further particularity of detail would more adequately convey to the accused the information needed .to apprise him of the nature and description of the.charge against him it is-impossible to conceive. Can it be supposed that at the trial he was taken by surprise when the corpus delicti was proved, or that he was insufficiently informed of the particulars of the crime with which he is charged, because the pleader did not add the words “ and so she died then and there,” or others of more ample and artificial character embodying the word “ died” after the words “ mortally suffocated, choked and drowned.”
Could there be any difficulty in pleading an acquittal under this indictment in bar of a subsequent prosecution for the same offenses or the slightest hesitation in identifying the crime charged by its name, and its particulars ?
The layman would need no fuller or more definite description of the charge, and it requires the finger of the technical criminal pleader to indicate the point at which the indictment fails to answer its purpose. The dififiulties and shortcomings are not such as affect the accused in his trial on the indictment, his information of the accusation, or his ability to meet it. Not even the weakest and most unreasoning sentimentality could honestly assist it. The proposition is, that the court cannot permit judgment to be entered upon the verdict, because the indictment does not on its face show that the death occurred within a year and a day, and because the death of Agnes Watson is not alleged at all. It is said that *89 neither fact is legally charged. The court is asked to apply some supposed technical and occult rules and reasoning to' the subject, and to come (and it has come) to a conclusion which the ordinary, and, as well, the intelligent and thinking layman would regard as impossible. The defects are such,, not from the standpoint of the accused, but from the standpoint of the asserted necessity of a blind and unreasoning adherence to precedent.
Let us take the two grounds of the motion in their inverse order. Does the indictment show that the death occurred within a year and a day? If “ mortally drowned” means dead, and the words “then and there” have the signification ordinarily given them in criminal pleading (Bishop Crim. Prac., 407-8-9), and refer to the antecedent, 23d day of June, 1888, and to the place as the District of Columbia, and the canal, it is plainly stated that Agnes Watson died on the 23d day of June, 1888, in the District of Columbia; and leaving out the words “then and there,” if drowned means dead it is apparent on the face of the indictment, that the stroke or assault being charged on the 23d day of June, 1888, and that the indictment was filed in court the 24th day of September, 1888, the death occurred within a year and a day. So that, if there is a failure to aver the time of death, it is not fatal. In a recent case decided in April, 1891, Ball and Boutwell vs-United States, the Supreme Court held, “it may be conceded that as this indictment was found on the 17th of October, 1889, and the day of the assault is fixed as on the 26th of June, of that year, and it is asserted that Box died, the failure to aver the time of death is not fatal.”
This question is, how7ever, absolutely dependent upon the determination of the other question, inasmuch as if “ mortally drowned” does not mean dead, there is no averment of death at any time.
The next question, and the question of the case, is, whether the death of Agnes Watson has been sufficiently alleged.
The doctrine is laid down that except as to a few technical terms, and the particular words of a statute .where the indict *90 ment is on it, language used in its ordinary and non-professional import will suffice, i Bish. Crim. Prac., 509.
In an indictment for murder the technical words for which there are no substitutes are “malice aforethought” and “ murder.” 1 Saunders Wms., 353; 1 Bish. Crim. Prac., 335.
The operative words of Statute 23 Henry VIII, chap. 1, sec. 3, were “willful murder of malice prepensed.” Its re-enactment in 1 Edw. VI, chap. 12, sec. 10, omits the word “ willful,” which then became no longer essential, and it takes away the benefit of clergy from anyone “ attainted or convicted of malice prepensed.” In Wms. note to 1 Saund., 356, it is said: “ Murder being one of the effective words of the statute, it must be in the indictment. In the absence of this word, the indictment will only be for manslaughter, “ murdravit” must be used to distinguish it in order to oust the offender of his clergy.
It is no new thing in criminal pleading to dispense with the use of words which are not words of art, and to substitute others that express the sense intended, or to dispense with averments which common sense indicated were useless and not requisite.
It was at one time deemed essential to the validity of an indictment for homicide that the stroke should be alleged by the use of the word plaga, and it was contended in Long’s Case, s Coke, 122«, that the indictment was bad because the word vulnus was substituted; the pleader is said to have used the words “ unum vulnus mortale, where it ought to be unam plagam, which is the word used in all indictments, and that vulnus should not be used in indictments any more than ictus which also signifieth a stroke. But this exception was disallowed per totum curiam, for plaga and vulnus are synonima, and idem significant, although plaga is the more usual word in indictments.” In the same case an exception was taken because the length and depth of the wound was not shown, and this was disallowed because that “ought to be alleged to the intent that it might appear to the court that the wound was mortal, so that it may appear to be the occasion of the *91 •death, but in this case the wound was through the whole body so that it was apparent to be mortal, and in some cases "the dimensions cannot be alleged, as when a member has the knee, or the hand, or the foot, or the head are cut off.”
In Rex vs. Tomlinson, 6 Car. and P., 370, it is said by Patterson, J., “ my brother recollects the case (Rex vs. Mosely) perfectly well and informs me that it was very much discussed, and that the ground of the decision was that as common sense did not require the length, etc., of wounds to be stated it was not necessary that they should be stated.”
In State vs. Corley, 39 Me., 93, it is said that “when death is occasioned by a wound it should be stated to have been mortal. It must appear from the indictment that the wound given was sufficient to cause death, and for this reason, unless it otherwise appear that the length and depth must be shown.”
The wound, then, need not be described as to length and depth; it is sufficient if it appears to have been mortal, and it would seem to follow that if the wound described is necessarily fatal, as for instance if the head were cut off, it would not be necessary to allege that it was a mortal wound.
If unam plagam mor talent could be substituted by umtm vulnus moríale, because idem significant, the distinct statement of death by the use of that word, may be well substituted by any language which in its ordinary and non-professional import will suffice to express it. The word died is not a word of art, and if this indictment, which in every other respect is conceded to contain the necessary technical words to allege the crime of murder, alleges by the use of ordinary language that Agnes Watson ceased to live, it must be sufficient.
It is urged that the stroke, the mortal wound, and the •death must all be alleged, and it is claimed that this indictment stops at the allegation of the mortal wound; that is to say, that mortally suffocated and drowned means nothing more than mortally wounded;
But this claim can only be applicable to cases where there was an assault and a wound, and yet there are many felonious homicides without these elements, as in the case of homicides *92 by poison, by neglect, and others, and then doubtless the indictment need not aver that which does not exist.
But apply the measure insisted upon to the charges in this indictment. They consist, first, of the assault “ in and upon the body of one Agnes Watson * * * did make an assault;” second, the fatal wound “ did take her into the hands of him * * * and * * * cast, throw and push * * * into a certain canal * * * wherein * * * was a great quantity of water;” third, the death, “ by means of which * * * Agnes Watson * * * with the water aforesaid was mortally choked, suffocated and drowned.”
In the case of Holis vs. Pettit, Plowden, 253, an action of trespass to land, in which the plea was that the plaintiff’s husband, who had been possessed of a-term of years in the land in controversy jointly with the plaintiff, had feloniously and voluntarily drowned himself, and the term had become forfeited to the King and Queen, it is learnedly argued by the counsel (Sergts.) for the plaintiff thus:
“And the cause of the death is the act done in the party’s lifetime, which makes the death to follow. And the act which brought on the death here was the throwing himself voluntarily into the water, for this was the cause of his death. And if a man kills himself by a wound which he gives himself with a knife, or if he hangs himself, as the wound or the hanging which is the act done in the party’s lifetime is the cause of his death, so is the throwing himself into the water here.”
The court in its opinion treated the throwing himself into the water as the cause of death, the mortal wound, and held “that the forfeiture of the goods and chattels, real and personal, shall have relation to the act done by Sir James Holis in his lifetime, which was the cause of his death, viz: the throwing himself into the water.” Had they treated the drowned condition as the mortal wound, the term would not have been forfeited, because the plaintiff’s right as survivor would have supervened.
If it is necessary in this indictment to find the three elements mentioned, they are there, and logically in order. They *93 are not essential, however, in a case of this nature, where there was actually no stroke and no mortal wound.
Do mortally choked, suffocated and drowned mean dead? Are they ordinary and non-professional words which import and suffice to express death? If they do, and if they are, this indictment should be sustained.
Webster’s International Dictionary defines mortally as — in a mortal manner so as to cause death. Suffocated as — choked or killed by stopping respiration — synonym asphyxiated. Choked, as rendered unable to breathe by filling, pressing upon or squeezing the windpipe; suffocated, stifled, strangled. Drowned as suffocated, in water or other fluid; perished in water; deprived of life by immersion in water or other liquid.
These definitions from a standard work but confirm the common understanding of commen men as to the common import of words in common use. There could be no two interpretations of the language used. The present participle drowning is a well-known word indicating, when applied to a human being, a condition which demands prompt succor, otherwise the result will be death. The past participle drowned means, and for centuries has meant in common and legal parlance, a fixed condition, deprived of life, dead. No diligent inquiry of lexicographers is demanded; the use of the word drowned to convey the fact and the manner of death is a use of it in its plain and ordinary signification.
In the case of Holis against Pettit, just mentioned, some centuries since, a plea in bar set up as defense to an action of trespass that the husband of the plaintiff, who was joint lessee with the plaintiff, threw himself into the river and feloniously and voluntarily drowned himself, and the inquisition of the coroner embodied in the plea, substantially in the same form, charges that he threw himself into the river and voluntarily and feloniously drowned himself. The words “ and so he died” are omitted both in the plea and in the inquisition, and it is plainly indicated that, according to the ordinary, accepted and well understood meaning of the words, he was then the cause of his own death.
*94 This case is cited not for the purpose of indicating the mere fact that in a civil case a plea in bar alleged that the deceased had caused his own death by the use of the words “ drowned himself,” but that the words at that time were so well understood to have that settled meaning that they were deemed sufficient in a plea to a civil action to allege that important fact.
The use of the same word “ drowned,” without more, in the inquisition of the coroner, pleaded in the same plea, is referred to not for the purpose of attempting to bolster up an indictment by what is called ‘‘Crowner’s quest law,” but to indicate the accepted meaning of the words, and as well that they were used for. the purpose of stating the very essential fact in an instrument which is certainly required to be in some degree artificial and technical in expression, for no part of the personal estate of a felo de se vests in the King before the self-murder is found by some inquisition. 5 Co. R., 110, 63; 1 Saund., 362; 1 Sid., 162; and such inquisition must use technical words to express the self-murder.
As a further indication of the ancient and well understood sense of death conveyed by the word drowned, the play of Hamlet, Act v, Scene 1, may be referred to.
1st Clown — “ Give me leave. Here lieth the water; good ; here stands the man; good; if this man go to this water and drown himself, it is will he, will he, he goes mark you that: But if the water come to him, and drown him, he drowns not himself; argal, he that is not guilty of his own death shortens-not his own life.”
This play is said to have been first published in 1603, and its author, whoever he may have been, was wonderfully gifted, in the apt use of language. The ridicule thrown upon “ Crowner’s quest law” was not directed at the form in which a conclusion was expressed, but it was directed at the absurdity of the conclusion that was reached to the subversion of the _ law.
I am compelled to the opinion that the conclusion that the language of the indictment does not express and state the *95 death of Agnes Watson is violence done to the ordinary import of the words used.
If it is conceded that there is a defect in the averment of the death because the words used are lacking in technical accuracy, yet the defect should be held to be a mere defect in form, which did not operate to the prejudice of the defendant, and that therefore, under Sec. 1035, Rev. Stat. U. S., the indictment should not be deemed insufficient.
This section is as follows:
“No indictment found and presented by a grand jury in any District or Circuit or other Court of the United States shall be deemed insufficient, nor shall the trial judgment or other proceeding therein be affected by reason of any defect or imperfections in matter of form only which shall not tend to the prejudice of the defendant.”
In U. S. vs. Jackson, Lowell, J., upon this subject, says : “It is somewhat difficult to say what is form and what substance in an indictment. A nice critic might insist that form is substance in criminal pleading, but the statute is intended to have some effect, and I have been disposed to .give it a liberal construction. I have held 'that a particular intent which made an act a crime by the words of the statute is part of the substance. On the other hand, mere mistakes, however serious, in expressing the substance of a crime, if the meaning can be understood, I look upon as formal.”
In Rex vs. Clover, 1 Sid., 259, the inquisition of the coroner was alleged to be defective in the particular urged against this indictment, and it was held amendable as merely a defect of form; and 1 Williams, Saunders, 356, note, referring to it says: “ But if the inquisition be good in substance, the coroner may be served with a rule of K. B. to amend a defect inform ; * * * as where it was found that G., seif sum felonice sitbmersus fuit, but it was not said that he threw himself into the-water, nor did the inquisition conclude with “and so he died.” The court ordered the inquisition to be amended in these particulars, conceiving them to be mere matters of form, for the substance, namely, felonice submersus fuit was found; or, as the *96 report has it, “ because felonice submersus fuit is the substance.” Although this reasoning was applied only to a coroner’s inquisition, by the King’s Bench, in 17 Car., II, it is perfectly applicable to this indictment and is as good to-day as then.
By successive decisions, indictments from time to time have been stripped of verbiage and. averments once regarded as absolutely essential and vital. It is no longer necessary to charge that the murderer was “ moved and seduced by the instigation of the devil,” nor to aver that the victim was “ in the peace of God and of our Lord the King,” or its equivalent; nor the value of the weapon, nor the length and depth of the wound, nor in which hand the weapon was held, nor is the artificial use of the word “ languishing” essential.
The decision of the court on this motion is, in my judgment, a step backward in the direction of useless and senseless formality, rather than a step forward in the direction of the modern tendency towards directness and simplicity.